Case 10-30571-RG    Doc 13    Filed 07/02/10    Entered 07/02/10 14:26:22    Desc Main
Document      Page 1 of 15

| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT** <br> **DISTRICT OF NEW JERSEY** <br> Caption in Compliance with D.N.J. LBR 9004-2(c) <br> **WASSERMAN, JURISTA & STOLZ, P.C.** <br> **225 Millburn Avenue - Suite 207** <br> **P.O. Box 1029** <br> **Millburn, New Jersey  07041** <br> **Phone: (973) 467-2700** <br> **Fax: (973) 467-8126** <br> **Counsel to Debtor** <br> **DANIEL M. STOLZ (DS-1897)** | |
| In Re: <br><br> **RIDGEWOOD CORP.,** <br><br><br>                       Debtor. | Case No.:  10-30571 <br><br> Hon. Rosemary Gambardella <br><br> Chapter: 11 <br><br> Hearing: |

**MOTION FOR A SALE OF**
**SUBSTANTIALLY ALL ASSETS**

      **RIDGEWOOD CORP.** (hereinafter "Ridgewood" or the "Debtor"), by and through its counsel, Wasserman, Jurista & Stolz, P.C., hereby respectfully moves before this Court as follows:

      1.     On June 18, 2010, General Plumbing Supply, Aaron & Company and Birdsall filed an Involuntary Chapter 7 Petition against the Debtor.

      2.     On June 23, 2010, the Court entered an Order shortening time, scheduling a hearing on a Motion by the Petitioning Creditors for the appointment of an Interim Trustee, scheduling the hearing for January 24, 2010.

3. On June 23, 2010, this Court entered an Order Shortening Time, scheduling a hearing for June 24, 2010, on the Motion by Sovereign Bank, seeking relief from the automatic stay to be permitted to enforce it's secured claim against the Debtor's assets.

4. On June 24, 2010, the Court conducted a hearing on the Motions of the Petitioning Creditors and Sovereign Bank. During the course of said hearing, the Debtor, through its counsel, expressed the Debtor's intention to file a Voluntary Chapter 11 Petition.

5. Based upon the Debtor's representation that it would be filing a Voluntary Chapter 11 Petition and thereafter filing the within motion to sell assets, the Petitioning Creditors withdrew their Motion for the appointment of an Interim Trustee. The Sovereign Bank Motion for Relief from the Automatic Stay has been adjourned to the return date of the within Motion.

6. On July 2, 2010, the Debtor filed a Voluntary Petition, pursuant to 11 U.S.C. 1101 et. seq. The Debtor has been certified a Debtor in Possession and remains in possession and control of its assets.

7. The Debtor has submitted Applications for the retention of Wasserman, Jurista & Stolz, P.C. to serve as Bankruptcy counsel for Brown, Moskowitz & Kallen, P.C. to serve as transactional counsel and for the retention of Morris-Anderson & Associates, Ltd. to serve as Financial Advisors.

8. Ridgewood is engaged in the supply of plumbing, heating and air conditioning products. Ridgewood's corporate offices are located at 500 Corporate Drive, Mahwah, New Jersey.

9. Jules (a/k/a Mickey) Weinstein is the Chief Executive Officer of Ridgewood. His son, Stuart Weinstein, is the President of Ridgewood. Jules, his wife Myrna, and Stuart are the sole stockholders of Ridgewood.

10. Ridgewood was formed in 1922 and had been a very successful business for many years. Initially, Mickey Weinstein had several partners in the business. As those partners grew older, or passed away, the stock ownership of the partners was purchased by Mickey and Stuart Weinstein.

11. In order to appropriately service the needs of Ridgewood customers, Ridgewood opened supply facilities in New Jersey, New York and Pennsylvania. At one time, Ridgewood maintained as many as 17 supply facilities.

12. In late 2008 and 2009, Ridgewood's business began to experience substantial losses as a result of the general economic decline and industry related issues. For the year 2009, Ridgewood suffered an operating loss of approximately $2 million. Ridgewood's sales volume decreased from high of $71.75 million in 2006 to $33.85 million in 2009.

13. Management of Ridgewood took all available steps to reduce overhead expenses, including closing a number of less profitable supply facilities and significantly reducing staffing. Unfortunately, even those reductions did not stem the tide of continuing losses.

14. During early 2010, Ridgewood's finances and business operations continued to deteriorate, on an accelerating basis.

15. In March 2010, Ridgewood retained Morris Anderson, a nationally known and recognized restructuring advisor, to evaluate Ridgewood's business and determine whether Ridgewood could survive the tide of continuing operating losses.

**The Sovereign Loan**

16. In 2003, Ridgewood entered into a borrowing relationship with Sovereign Bank ("Sovereign"). The initial lending relationship was based upon a $20 million revolving credit facility plus a $500,000.00 equipment line.

17. The initial lending arrangement was amended and modified in 2006 and twice during 2007.

18. As Ridgewood's business volume began to decline and it began to suffer losses, Sovereign and Ridgewood from time to time restructured the lending relationship to adjust the borrowing base components of the revolving credit facility to reflect the changing level of business of Ridgewood and its borrowing needs, including creating or modifying sublimits of the borrowing base availability against inventory and the maximum line available to Ridgewood.

19. On or about March 8, 2010, Sovereign notified Ridgewood of the occurrence of events of default under the loan arrangement.

20. On or about April 15, 2010, Sovereign served Ridgewood with a Notice of Partial Exercise of Remedy and Reservation of Rights.

21. Ridgewood remains in default under the Sovereign Loan Agreement and the outstanding principal balance of the advances under the revolving credit facility is well beyond the lending limits and the borrowing base formula established under the Loan Agreement.

22. Sovereign holds a validly perfected lien on all assets of Ridgewood, including its inventory, accounts receivable, equipment, contract rights and general intangibles.

23. Sovereign also holds a first mortgage on certain real property and improvements located in Tenafly, New Jersey owned by Ridgewood. The mortgage secures all obligations and

liabilities of Ridgewood to Sovereign, including the loans under the revolving credit facility, equipment term loan, and a term loan in the original principal amount of Eight Hundred Thousand Dollars ($800,000.00) and on which term loan there is currently owing the approximate principal balance of Seven Hundred Twenty Thousand Dollars ($720,000.00) plus interest, fees, and expenses.

24. As of June 21, 2010, Sovereign is owed by Ridgewood the approximate aggregate principal amount of Five Million Five Hundred Twenty Two Thousand Five Hundred Ninety Dollars ($5,522,590.00) plus interest, late fees, counsel fees and other charges.

25. The Debtor's inventory at cost is approximately Six Million Seven Hundred Thousand Dollars ($6,700,000.00), however, Four Million Dollars ($4,000,000.00) of that inventory is slow moving or non-moving. When the inventory had a cost value of Eight Million Seven Hundred Thousand Dollars ($8,700,000.00), Accuval Appraisal valued the inventory at Three Million Seven Hundred Thousand Dollars ($3,700,000.00) orderly liquidation value and One Million Five Hundred Thousand Dollars $1,500,000.00) forced sale value. Those figures should now be reduced as the inventory has shrunken by Twenty Three Percent (23%). Applying that reduction, the inventory presently has an orderly liquidation value of Two Million Eight Hundred Fifty Thousand Dollars ($2,850,000.00) and a liquidation value of One Million One Hundred Fifty-Five Thousand Dollars ($1,155,000.00).

26. As of June 21, 2010, Ridgewood's accounts receivable totaled $2,975,607 of which $1,506,444 is over ninety (90) days old and therefore of questionable collectability.

27. Ridgewood's machinery and equipment is quite old and of limited value. It is estimated that all of Ridgewood's fixtures, machinery and equipment would bring approximately $24,000 in a liquidation.

28. The Tenafly property was recently appraised for a fair market value of Nine Hundred Thousand ($900,000.00). This value does not take into account costs and expenses that would need to incurred to sell the Tenafly property in an orderly fashion, and the costs and expenses that would need to be incurred during the anticipate extended period of time of the sale process, including the payment of brokerage commissions, taxes, insurance, utilities, security, and the like. As stated above, the Tenafly property is subject to a first mortgage held by Sovereign securing all obligations and liabilities of Ridgewood to Sovereign.

29. Based upon estimates by Morris Anderson, even if the inventory and accounts receivable are sold and collected in an orderly process to maximize value, the net proceeds recovered would amount to at least $1 million less than the amount due to Sovereign on its revolving credit facility as of the date hereof, excluding costs and expenses that would need to be incurred in liquidating/collecting the inventory and accounts receivable.

30. None of the principals of Ridgewood are indebted on personal guarantees to Sovereign.

31. As a result of declining revenue, loss of customers and key employees, partially some of which resulted from news of Ridgewood's financial troubles and the Involuntary filing, Ridgewood does not have sufficient cash flow, even if Sovereign permits use of cash collateral to sustain its operations through a closing on any disposition of its assets. The Debtor and Sovereign are taking all available steps to expedite a disposition of the Debtor's assets. The

Debtor intends to file, as a First Day Motion, an Application to the Court to permit post-petition financing by Sovereign, up to a maximum amount of $1,300,000.00, to provide funding for the Debtor's essential operations through the consummation of a disposition of the Debtor's assets. In return, the Debtor shall ask the Court to grant Sovereign a blanket lien on all of the Debtor's assets to secure such post-petition financing.

### The Real Property Leases

32. Ridgewood is party to fourteen (14) real property leases (the "Leases"). Annexed hereto and marked Exhibit "A" is a listing of the relevant terms of the Leases. Copies of all leases pertaining to the properties reflected on Exhibit "A" have been provided to counsel for the Petitioning Creditors.

33. Ten of the properties are leased from entities controlled by members of the Weinstein family (the "Related Party Leases").

34. The remaining four properties have been leased from third party Landlords (the "Third Party Leases").

35. The Debtor continues to operate from all of the leased locations, with the exception of the Voorhees facility, which was closed several months ago.

36. The Mahwah facility consists of 15,785 square feet of warehouse space, plus approximately 23,000 square feet of office space.

37. Because the Related Party Landlords and Ridgewood were both controlled by members of the Weinstein family, significant attention was not paid to the details of the related party leases. Supervision of the Leases was primarily handled by Frank Geramita, Ridgewood's former CFO. Mr. Geramita was let go, in a cost-saving effort, in late 2009.

38. A binder of Leases has been retrieved from Mr. Geramita's records. A review of the leases has revealed that although the Leases for the locations at Harriman, Newburgh, Middletown, Kingstown and Ivy Land all make reference to a Tenant option to renew, the rent for renewal period is nowhere to be found in the Leases. Indeed, the Leases to these properties state that the rental for the renewal period is to be found in Section III (c) of the Leases. None of these five Leases contain a Section III (c), or any other provision addressing the rental to be paid during the renewal periods.

39. The Debtor's counsel has performed research as to the impact of missing renewal rental terms in the leases. Although case law has been found which permits a Court to insert reasonable provisions in a Contract where language of the Contract is vague or ambiguous. See, Elliot & Frantz v. Ingersoll-Rand Company, 457 F.3d 312 at 327 (3rd Cir. 2006), the majority of cases hold that where an integral provision of the Lease is missing, the Court should not insert provisions and should merely deem the contract to be void and of no effect. Harrington v. Verrilli, 151 F. Supp. 2nd 449 at 462 (S.D. N.Y. 2001); Steffen v. Dumke, 312 WIS. 2d 812, 754 N.W. 2d 254, 2008 W.L. 2120012 (Wis. App. 2008); Bartsch v. Gordon N. Plumb., Inc., 485 N.E. 2d 1105 (Ill. App. Ct. 1985); Brechman v. Adamar of New Jersey, Inc., 182 N.J. Super. 259, 448 2d 480 (Sup. Ct. 1981); Philips v. Thomas, 92 N.J. Eq. 248. (E. & A. 1920).

40. The five Leases set forth above all expire on or before 2013. The amounts necessary to cure the defaults under these Leases will be substantial and combined with Sovereign's nondisturbance rights, it would appear that none of the five Leases could hold value to the Bankruptcy Estate.

41. The Mahwah, Clinton and Westwood Leases run through 2017. The Voorhees Lease runs through 2019 and the Parsippany Lease runs through 2023.

42. The Lease from Excel Corporate Park to Ridgewood regarding the Lakewood, New Jersey facility expired on April 30, 2010.

43. The Hackensack property is leased from Zeril Zerlip, the sister of Jules Weinstein, on a month to month basis.

44. The Hawthorne Property is leased from Jacob and Millie Vandereems and expires on August 31, 2010.

45. The Mine Hill Property is leased from Iron Mountain Industrial Park and the Lease expires on February 28, 2013.

46. Through July 2010, Ridgewood is delinquent in rental on the Related Party Properties in an amount totaling $607,173.27. The specific delinquencies are set forth on Exhibit "A".

47. Through July 2010, the Debtor is delinquent on rental on the Third Party Leases in an amount totaling $71,864.30.

48. In connection with the loans from Sovereign to Ridgewood, Sovereign required both the Related Party Landlords and Third Party Landlords to execute Landlord's Release and Waiver Agreement (hereinafter "Landlord Waiver"). A sample of such Agreements is annexed hereto and marked Exhibit "B".

49. With regard to the Mahwah, Clinton, Parsippany, Middletown, Newburgh and Kingston properties, the Landlord Waiver permits Sovereign to remain in possession of the Leased Property to store and dispose of its collateral, for an extended period of time. For the first one

hundred fifty (150) days of occupancy by Sovereign, Sovereign is not obligated to pay rent or any other charges to the Landlord.

### The Sale to Sovereign

50. Shortly after Morris Anderson completed their initial review of the Debtor's operations, a conclusion was reached by management of the Debtor and Morris Anderson that Ridgewood could not continue to self-sustain and operate effectively.

51. Based upon the foregoing, management of Ridgewood requested that Morris Anderson assist in determining whether a buyer or buyers could be located, interested in purchasing the Ridgewood business assets.

52. Morris Anderson reached out to competitors in the geographic area. A number of those competitors, including the three Petitioning Creditors in the Involuntary Case, signed Nondisclosure Agreements with Ridgewood.

53. After conducting preliminary discussions with all parties who expressed an interest, Ridgewood and Morris Anderson identified a group of affiliates of Blackman Plumbing Supply Company (collectively "Blackman"), Inc. as the party likely to tender the most comprehensive and beneficial offer with respect to Ridgewood's assets. While many of the other competitors wished only to "cherry pick" certain of Ridgewood's assets and operations, Blackman was prepared to immediately enter into a comprehensive arrangement that would be expected to result in (a) Blackman's maintaining a plumbing supply business in all of Ridgewood's branch locations, (b) a significant capital investment by Blackman to upgrade and modernize these branches, (c) Blackman's acquisition of Ridgewood's Tenafly, NJ property, (d) the hiring of the vast majority of Ridgewood's approximately 70 employees, and, perhaps most

important, (e) the sale, on a consignment basis, of Ridgewood's inventory and the collection of its receivables, both in an orderly fashion and in the ordinary course of Blackman's business, thereby maximizing the proceeds available to creditors. The proposed arrangements with Blackman were also reviewed with Sovereign Bank, which agreed that, although it did not expect that the arrangements with Blackman would result in full repayment of the Sovereign loans, they would yield the highest and best recovery under the circumstances..

54. In exchange for agreeing to perform the extensive due diligence and other costs associated with the potential transaction, Blackman required the execution of a Letter of Intent, containing a "no shop" provision, that prohibited Ridgewood from conducting discussions with other potential parties-in-interest during the time that Ridgewood and Blackman attempted to finalize an agreement. Because Morris Anderson and management of Ridgewood believed that Blackman was the most beneficial and capable party, Ridgewood entered into the Letter of Intent containing the "no shop" provisions.

55. After an extraordinary amount of time and effort, both by the principals of Ridgewood and Blackman by Morris Anderson and by professionals employed by both Ridgewood and Blackman, the parties entered into a series of extensive agreements, copies of which were annexed to the Motion filed by Sovereign for Relief from the Stay.

56. It was contemplated that the transactions with Blackman would be consummated outside of a Bankruptcy proceeding through a surrender by Ridgewood of its assets to Sovereign and a secured party sale and consignment by Sovereign to Blackman.

57. After the Involuntary Petition was filed, the Debtor determined to file a Voluntary Petition under chapter 11 of the Bankruptcy Code and to proceed with the disposition of its assets pursuant to 11 U.S.C. § 363.

58. After extensive discussions with regard to a manner in which to structure a Section 363 Sale, it was determined that the Debtor would offer its assets for sale and that Sovereign would indicate its intention to credit bid for the assets in certain stated amounts. Sovereign has disclosed that, should it be the successful bidder for the assets, Sovereign, Blackman and the Debtor intend to consummate transactions substantially the same as those set forth in the agreements attached to Sovereign's Stay Relief Motion.

59. Annexed hereto as Exhibit "C" is a Term Sheet, setting forth the details of the Sovereign bid.

60. The sale to Sovereign, or any higher or better offeror, shall be sold in "as is" "where is" condition. The Sovereign offer to purchase the Debtor's inventory, accounts receivable and general intangibles is subject to Sovereign also being the successful bidder for the Debtor's lease designation rights.

61. The sale shall be subject to notice to the twenty (20) largest unsecured creditors and any parties who have expressed an interest in the purchase of the Debtor's assets and shall be subject to higher and better offers submitted in accordance with a Scheduling Order to be entered by the Court. Potential bidders are placed on notice that, should a bidder other than Sovereign be the successful bidder for any of the Debtor's assets, Sovereign reserves the right to enforce its Landlord's Waiver and that the Related Party Landlords shall demand a cure of all defaults under the Leases and adequate assurance of future performance by any new proposed Lessee. Neither

Sovereign nor the Landlords intend to assert these rights should Sovereign be the successful purchaser.

### The Weinstein Employment Agreements

62. Annexed hereto and marked Exhibit "D" are the terms and conditions of the proposed employment of Stuart Weinstein and Mickey Weinstein by Blackman, should Blackman be the successful purchaser of the Debtor's assets. The compensation set forth therein is significantly below what the Weinsteins had earned during the successful years of Ridgewood's operation and below market standards for executives with the experience and capabilities of the Weinsteins.

63. It is respectfully submitted that the terms and provisions of the APA and other Agreements between Blackman, the Debtor, Sovereign and the Weinsteins are fair and reasonable and have been negotiated at arms length and in good faith.

### RELIEF REQUESTED

**A.     The Sale Should be Approved Pursuant to Section 363(b) of the Bankruptcy Code (11 U.S.C. §363 (b) and Federal Rule of Bankruptcy Procedure 6004 (Fed. R. Bankr. P. 6004)**

64. Section 363(b)(1) provides that a debtor in possession may use, sell, or lease its assets, other than in the ordinary course of business. 11 U.S.C. §363(b)(1).

65. The leading case governing sales of assets out of the ordinary course in this District is In re Abbotts Dairies of Pennsylvania, Inc., 788 F. 2d 143, 149-50 (3d Cir. 1986). In addition to requiring that appropriate notice be provided to all creditors and parties in interest,

13

the Third Circuit Court of Appeals in <u>Abbotts</u> required a finding that the buyer was a "good faith" purchaser and that the buyer was purchasing for "fair value." <u>Id.</u> 788 F. 2d at 147.

66. In addition to the "good faith" and "fair value" standards of the <u>Abbotts Dairies</u> case, the Courts generally require Debtors in Possession to establish a "sound business purpose" in connection with any sale of their assets before confirmation of a Plan of Reorganization. <u>In re Lionel Corp.</u>, 722 F. 2d 1063 (2d Cir. 1983); <u>In re Delaware & Hudson Railway Co.</u>, 124 B.R. 169, 175-76 (D. Del. 1991); <u>In re Titusville Country Club</u>, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); <u>In re Sovereign Estates, Ltd.</u>, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); <u>In re Conroe Forge & Manufacturing Corp.</u>, 82 B.R. 781, 783-86 (Bankr. W.D. Pa. 1988); <u>In re Industrial Valley Refrigeration & Air Conditioning Supplies, Inc.</u>, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987).

67. The standard for demonstrating sound business justification for a pre-plan sale of assets is not an overly burdensome standard. A Debtor is "simply required to justify the proposed disposition with sound business reason." <u>In re Baldwin United Corp.</u>, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

68. It is respectfully submitted that the good faith requirement has been satisfied with regard to the proposed sale to Blackman. Typically, the misconduct that would destroy a purchaser's good faith status involves fraud, collusion between the purchaser and other bidders or an attempt to unfairly take advantage of the process. <u>In re Abbotts Dairies of Pennsylvania, Inc.</u>, <u>Supra.</u> 788 F.2d at 147 (3rd Cir. 1986). No such conduct is present in this case.

69. At the hearing on the within Motion, the Debtor will demonstrate that Sovereign is a good faith purchaser that satisfies the requirements of 11 U.S.C. 363(m). The sale to Sovereign has been negotiated at arms length. No principal or employee of the Debtor will hold

an ownership interest in the purchaser. The employment relationship between Blackman and the principals of the Debtor have been fully and completely disclosed.

70. In addition to the foregoing, the proposed sale will be exposed to the opportunity for other potential purchasers to submit higher or better offers, in accordance with the procedures set forth in the within Motion.

71. At the hearing on the within sale, the Debtor shall present testimony from the Debtor's Principal and the Debtor's Financial Advisors with regard to the value of the Debtor's assets, both under a forced liquidation or through a private sale. Said testimony will demonstrate that the purchase offer of Sovereign constitutes fair and reasonable consideration for the assets to be acquired.

72. Based upon the foregoing factors and the testimony to be produced at the hearing in this matter, it is respectfully submitted that the Debtor should be authorized to sell the assets set forth in the APA attached hereto to Sovereign or such other buyer as submits a higher or better offer for the purchase of the Debtor's assets.

**WHEREFORE**, the Debtor respectfully requests the entry of an Order approving the proposed sale of the Debtor's assets to Sovereign or such other party as submits a higher and better offer, together with such other and further relief as is just and equitable.

        WASSERMAN, JURISTA & STOLZ, P.C.
        Counsel for Debtor

          /s/ Daniel M. Stolz
    By:_____
        DANIEL M. STOLZ

Dated: July 2, 2010.